JUDGE HELLERSTEIN 1 1 CIV 4915

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADMIRAL INSURANCE COMPANY, )
)
   Plaintiff, )
)
v. )
)  Civil Action No.:
)
GOLDBERG, SCUDIERI & )
LINDENBERG, P.C.; GOLDBERG, )
SCUDIERI, LINDENBERG & BLOCK, )
P.C.; PAUL S. BLOCK; JOHN HELLER; )
And JO ANNA PILLITTERI, )
)
   Defendants. )
_____)

RECEIVED
JUL 18 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT FOR RESCISSION AND DECLARATORY JUDGMENT

   Admiral Insurance Company ("Admiral"), by its undersigned attorneys, for its Complaint for Rescission and Declaratory Judgment, states as follows:

### Preliminary Statement

   1. In this action, Admiral seeks rescission of a lawyers professional liability policy issued to Goldberg, Scudieri, Lindenberg & Block, P.C. ("GSL&B" or "Firm"), on the basis that there was a material misrepresentation in GSL&B's application for the policy. In the alternative, Carolina Casualty seeks a declaration that the allegations of a lawsuit filed by John Heller and Jo Anna Pillitteri against GSL&B and the other defendants in this action do not fall within the Insuring Agreement of the Admiral Policy, and therefore that Admiral has no obligation to provide coverage for the Heller/Pillitteri lawsuit.

### Jurisdiction and Venue

   2. This is an action for a declaratory judgment pursuant to 28 U.S.C. § 2201 and Rule 57 of the Federal Rules of Civil Procedure.

4837-3301-6330.1

3.      The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332(a), as the action is between citizens of different states, and the amount in controversy exceeds $75,000.

4.      Venue is proper in the Southern District of New York, as a substantial portion of the events that gave rise to the insurance coverage dispute occurred in this District, and the Admiral Policy was issued to a law firm whose office is located in this District.

5.      Admiral is a Delaware corporation with its principal place of business in New Jersey.

6.      GSL&B was at all times relevant herein a New York professional corporation with its principal place of business in New York, New York.

7.      Goldberg, Scudieri & Lindenberg, P.C. ("GS&L"), the successor to Goldberg, Scudieri, Lindenberg, & Block, P.C., is a New York professional corporation with its principal place of business in New York, New York.

8.      Paul S. Block ("Block") is a citizen and resident of New York.

9.      John Heller ("Heller") is a citizen and resident of New York.

10.     Jo Anna Pillitteri ("Pillitteri") is a citizen and resident of New York.

### The Underlying Heller/Pillitteri Lawsuit

11.     On April 21, 2011, Heller and Pillitteri filed a verified Complaint in Supreme Court, New York County ("Heller/Pillitteri lawsuit"). Named as defendants are GS&L, GSL&B, Block, and the other attorneys in GS&L and GSL&B, Alan J. Goldberg ("Goldberg"), David G. Scudieri (Scudieri), and Mark K. Lindenberg ("Lindenberg"). A true and accurate copy of the Verified Complaint is attached hereto as Exhibit A.

12.     Heller and Pillitteri allege that in 1997, they retained GSL&B to file a lawsuit against their landlord.  Thereafter, Block allegedly advised the plaintiffs that he filed the lawsuit, and, in late 1997, that he obtained a default judgment against plaintiffs' landlord.

13.     Soon thereafter, Block allegedly advised Heller and Pillitteri that they had a second meritorious action for defamation against their landlord, and that he would file such an action on their behalf.

14.     Heller and Pillitteri allege that in late 1998, they were advised that GSL&B had obtained a default judgment in the second action against plaintiffs' landlord.  Neither lawsuit was ever filed.

15.     In 1999, Block allegedly advised Heller and Pillitteri that he filed a lien against the landlord's building to secure payment of the default judgments.

16.     Heller and Pillitteri allege that in 2005, Block told them that the landlord's property had been sold, and that the proceeds were being held in an escrow account by the New York City Department of Finance.

17.     In 2006, Block allegedly advised Heller and Pillitteri that the Department of Finance transferred the funds into a separate account for their benefit, but that could only be accomplished by a series of transfers in small amounts.

18.     In late 2006, Block allegedly advised Heller and Pillitteri that he had persuaded the court to allow each of them to receive a monthly "stipend" in amounts between $1,000 and $2,500, pending disbursement of the entire amount of the funds.

19.     Heller and Pillitteri allege that at that time, they began receiving monthly checks drawn on GSL&B's escrow account.

20.    In or about 2007, Block allegedly advised Heller and Pillitteri that the Department Finance was refusing to consolidate their funds into a single escrow fund so as to allow full disbursement.

21.    Thereafter, Block allegedly advised plaintiffs that he had convinced the court to impose a 1% daily penalty on the Department of Finance, and that as a result, their judgment was valued at over $14,200,000.

22.    In or about 2008, Block advised Heller and Pillitteri that he filed a lawsuit against the Department of Finance and obtained a $5,000,000 default judgment.

23.    From 2008 to 2010, Heller and Pillitteri each continued to receive monthly checks drawn on the GSL&B's escrow account.

24.    On March 8, 2010, Block allegedly provided Heller and Pillitteri with a draft order that he represented he would submit to the court to set the amount of their judgment at $10,783,220.36.

25.    Heller and Pillitteri allege that on or about September 23, 2010, Block advised them that the court had agreed to increase their monthly "stipend" to $4,000.

26.    On November 9, 2010, Block allegedly told Heller to expect a disbursement of $7,000,000 by the following day.  Later that day or shortly thereafter, Heller and Pillitteri learned that Block had never filed the lawsuits against their former landlord.

27.    The Heller/Pillitteri Complaint contains causes of action for fraudulent misrepresentation against Block; fraudulent misrepresentation and failure to supervise Block against the other attorneys in GSL&B; and legal malpractice against all defendants.

**The Admiral Policy**

28.    Admiral issued Lawyers Professional Liability Policy No. 9954283, effective

May 25, 2010 to May 25, 2011 on a claims made and reported basis, to GSL&B (the "Policy").

A true and accurate copy of the Policy is attached hereto as Exhibit B.

29.     On information and belief, GS&L, GSL&B, Block, Goldberg, Scudieri, and

Lindenberg each contend that Admiral has a duty to defend and indemnify them in connection

the Heller/Pillitteri lawsuit.

30.     Admiral contends that it does not have a duty to defend or indemnify GS&L,

GSL&B, Block, Goldberg, Scudieri, or Lindenberg, in connection with the Heller/Pillitteri

lawsuit.  Therefore, there is an actual controversy between the parties.

### Block's Misappropriation of Client Trust Funds

31.     Beginning no later than late 2006, and continuing into September 2010, Block,

while a partner with GSL&B, issued monthly checks made out to Heller and to Pillitteri drawn

on GSL&B's IOLA Trust Account ("trust account").

32.     The funds in the trust account belonged to various clients of GSL&B.

33.     In the check register and check records for the trust account, Block indicated that

the checks had been made out to various legitimate entities, such as the New York City and New

York State Departments of Taxation.

34.     As a result of Block's misappropriation of funds from GSL&B's trust account,

GSL&B clients were deprived of their funds.

### COUNT I
### (Rescission)

35.     The allegations in paragraphs 1 through 34 are incorporated as though fully set

forth herein.

36.     On or about May 24, 2010, GSL&B submitted a Proposal Form (hereafter,
"application") for the Admiral Policy.  Attached hereto as Exhibit C is a true and accurate copy
of the application.

37.     The application was signed by Goldberg and is dated May 24, 2010.

38.     The application contains the following statements above the signature line:

The undersigned acting on behalf of the Applicant Firm and all persons proposed for
this insurance declares that the statements set forth herein are true and correct and
that thorough efforts have been made to obtain sufficient information to facilitate the
proper and accurate completion of this Proposal Form.

The undersigned agrees that the particulars and statements contained in the Proposal
Form and any material submitted herewith are their representations and that they are
material and are the basis of the insurance contract.  The undersigned further agree
that the Proposal Form shall be considered attached to and a part of the Policy.  Any
material submitted with the Proposal Form shall be maintained on file with the
Insurer and shall be deemed to be attached hereto as if physically attached.

It is further agreed that:

• if any significant change in the condition of the applicant is discovered between
   the date of this Proposal Form and the Policy inception date, which would render
   this Proposal Form inaccurate or incomplete, notice of such change will be
   reported in writing to the Insurer immediately;

• any Policy, if issued, will be in reliance upon the truth of such representations;

• this Proposal Form has been completed as respects the entire Applicant Firm;

• and the signing of this Proposal Form does not bind the undersigned to purchase
   the insurance.

39.     The application contains the following question 17:

Is the Applicant Firm or any lawyer in the Applicant Firm aware of any fact,
circumstance, or situation that might result in any professional liability claim or suit
against the Applicant Firm, or any predecessor in business, or any past or present
lawyers in the Applicant Firm?

If "Yes," provide full details on the Claim/Incident Supplemental Form (LPL 9610).

40.     In its response to question 17, GSL&B did not disclose that beginning no later than late 2006, Block had been engaged in ongoing misappropriation of client trust funds from the GSL&B trust account.

41.     In its response to question 17, GSL&B also failed to disclose that the Firm had failed to file two lawsuits on behalf of John Heller and Jo Ann Pillitteri that Block represented had been filed in or about 1997 or 1998, and in which Block represented default judgments had been obtained in Heller's and Pillitteri's favor.

42.     Each of the matters referred to in paragraphs 43 and 44 constituted facts, circumstances or a situation that might result in a professional liability claim or suit against GSL&B or any of its attorneys, and therefore were required to have been disclosed in response to question 17.

43.     Each of GSL&B's misrepresentations was material, as Admiral would not have issued the Policy had GSL&B disclosed either of the misrepresentations.

44.     Admiral is therefore entitled to rescission of the Policy.

45.     Admiral hereby tenders the premium upon judgment of rescission.

### COUNT II
### (Insuring Agreement)

46.     The allegations in paragraphs 1 through 34 are incorporated as though fully set forth herein.

47.     The Insuring Agreement of the Policy provides as follows:

**Lawyers Professional Liability Insurance**

This Policy shall pay on behalf of the **Insured** all **Damages** and **Claims Expense** that the **Insured** shall become legally obligated to pay, arising from any **Claim** first made against the **Insured** during the Policy Period and reported to the **Insurer** in writing during the **Policy Period** or within 60 days thereafter, for any actual or alleged **Wrongful Act**, provided that prior to the

inception date of the first Lawyers Professional Liability Insurance Policy issued by the **Insurer** to the **Named Insured**, which has been continuously renewed and maintained in effect to the inception of this **Policy Period**, any **Insured** did not know, or could not reasonably foresee that such actual or alleged **Wrongful Act** might reasonably be expected to be the basis of a **Claim**.

48.  The Policy definitions of "Claim" and "Wrongful Act" are as follows:

"**Claim**" means a written demand for Damages or non-monetary relief by reason of a **Wrongful Act**, including, but not limited to:

1.  a civil, criminal, administrative or arbitration proceeding, or
2.  a request that an **Insured** agree to waive a legal right or sign an agreement to toll the statute of limitations.

**Claim** shall not include any proceedings before a state licensing board or similar authority, except as otherwise provided in section V. Supplemental coverage of this Policy.  A **Claim** shall be deemed to have been first made at the time notice of the **Claim** is first received by any **Insured**.

"**Wrongful Act**" means any actual or alleged act, omission or **Personal Injury** arising out of **Professional Services** rendered by an **Insured** or by any person for whose act or omission the **Insured** is legally responsible.

49.  The first Admiral Lawyers Professional Liability Policy issued to GSL&B was Policy No. 9847420, effective May 25, 2008 to May 25, 2009.

50.  Prior to the May 25, 2008 effective date of the first Admiral Lawyers Professional Liability Policy issued to GSL&B, Block knew, or could have reasonably foreseen, that the acts, errors or omissions on his part alleged in the Heller/Pillitteri Verified Complaint might reasonably be expected to be the basis of a Claim by Heller and/or Pillitteri.

51.  Admiral therefore has no duty to defend or indemnify GSL&B, GS&L, Goldberg, Scudieri, Lindenberg, or Block, in connection with the Heller/Pillitteri lawsuit, as the Heller/Pillitteri Claim does not fall within the Insuring Agreement of the Policy.

WHEREFORE, Admiral Insurance Company respectfully requests that the Court enter judgment in its favor and against the defendants herein, and that the Court find that Admiral is

entitled to rescind Lawyers Professional Liability Policy No. 9954283, effective May 25, 2010 to

May 25, 2011, issued to Goldberg, Scudieri, Lindenberg & Block.  In the alternative, Admiral

requests that the Court find that the underlying lawsuit filed by John Heller and Jo Ann Pillitteri

in Supreme Court, New York County, does not fall within the Insuring Agreement of the

Admiral Policy.  Admiral further requests that the Court declare that Admiral has no duty to

defend or indemnify Goldberg, Scudieri, Lindenberg & Block; Goldberg, Scudieri &

Lindenberg, Alan J. Goldberg; David G. Scudieri; Mark K. Lindenberg; or Paul S. Block in

connection with the lawsuit filed against them by John Heller and Jo Ann Pillitteri.

Dated:  July 15, 2011

Respectfully submitted,

Stephanie A. Nashban (SN-6806)
LEWIS BRISBOIS BISGAARD & SMITH LLP
77 Water Street, Suite 2100
New York, New York 10005
E-Mail: nashban@lbbslaw.com
Telephone: (212) 232-1300
Facsimile: (212) 232-1399

*Attorneys for Plaintiff*

Of Counsel
Jeffrey A. Goldwater
jgoldwater@lbbslaw.com
Robert A. Chaney
rchaney@lbbslaw.com
Lewis Brisbois Bisgaard & Smith LLP
550 West Adams St. – Suite 300
Chicago, Illinois 60661
Telephone:    (312) 345-1718
Facsimile:    (312) 345-1778

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------X

JOHN HELLER and JO ANNA PILLITTERI,

               Plaintiffs,

      -against-

GOLDBERG, SCUDIERI & LINDENBERG, P.C,
GOLDBERG, SCUDIERI & LINDENBERG, & BLOCK, P.C
ALAN J. GOLDBERG, DAVID G. SCUDIERI,
MARK K. LINDENBERG, PAUL S. BLOCK,

               Defendants.
-------------------------------------------------------------------------X

Index No. _10506_1/_11_ /2011

**COMPLAINT**

APR 2 8 2011

     Plaintiff John Heller ("Plaintiff Heller") and Plaintiff Jo Anna Pillitteri ("Plaintiff Pillitteri") (collectively, the "Plaintiffs"), by and through their attorneys, The Law Offices of Jeffrey Lichtman and Nesenoff & Miltenberg, LLP, allege upon information and belief the following as their complaint against the named Defendants in this action.

## THE PARTIES

    1.    At all times relevant to this action, Plaintiff Heller was a resident of the State and County of New York.

    2.    At all times relevant to this action, Plaintiff Pillitteri was a resident of the State and County of New York.

    3.    At all times relevant to this action, Goldberg, Scudieri & Lindenberg, P.C. and its successor as well as its predecessor, Goldberg, Scudieri, Lindenberg & Block, P.C. (the "Defendant Law Firm") was a professional corporation engaged in providing legal services in the State and County of New York.

4.      At all times relevant to this action, Alan J. Goldberg ("Defendant Goldberg") was an attorney duly admitted to the practice of law in the State of New York and was a partner at the Defendant Law Firm.

5.      At all times relevant to this action, David G. Scudieri ("Defendant Scudieri") was an attorney duly admitted to the practice of law in the State of New York and was a partner at the Defendant Law Firm.

6.      At all times relevant to this action, Mark K. Lindenberg ("Defendant Lindenberg") was an attorney duly admitted to the practice of law in the State of New York and was a partner at the Defendant Law Firm.  (Collectively, Defendant Goldberg, Defendant Scudieiri and Defendant Lindenberg are sometimes collectively referred to as the ("Defendant Partners.")

7.      At all times relevant to this action, Paul S. Block ("Defendant Block") was an attorney duly admitted to the practice of law in the State of New York and was at various times an associate and then a partner at the Defendant Law Firm.

8.      The Defendant Law Firm, Defendant Goldberg, Defendant Scudieri, Defendant Lindenberg and Defendant Block are sometimes hereinafter referred to as "Defendants."

### Significant Events Unknown to Plaintiffs

9.      On two separate occasions, the Appellate Division, First Judicial Department, suspended Defendant Block from the practice of law for misconduct which was in all significant respects identical to that visited upon Plaintiffs and which forms the basis of this Complaint. This fact was unknown to Plaintiffs.

10.    In or about March 2000, a Disciplinary Complaint was filed with the Departmental Disciplinary Committee of the Appellate Division, First Judicial Department, against Defendant Block.

11.    Effective May 3, 2001, Defendant Block was suspended for a six-month period for:

> deliberately deceiving clients (a husband and wife) through lies and fabrication of documents to corroborate those lies, and by neglecting the clients' affairs.... [misconduct which] was aggravated by his deliberate oral and written misrepresentations in a protracted effort to cover up his delinquencies, including false assurances to his client as to the status of their case when, in fact, the matter was never commenced. Indeed respondent went so far as to instruct his clients to appear in court on two separate occasions for a nonexistent hearing, and to fabricate a letter, which he claimed was sent to a Judge, and three proposed orders.

In the Matter of Paul S. Block, 282 A.D.2d 12, 723 N.Y.S.2d 23 (1st Dept. 2001).

12.    Defendant Goldberg represented Defendant Block in this disciplinary matter.

13.    In or about February, 2008, Defendant Block was served with notice of another disciplinary complaint.

14.    Effective September 17, 2010, the Appellate Division, First Judicial Department, suspended Defendant Block from the practice of law for an eighteen-month period, for "almost the same exact misconduct" that had led to his 2001 suspension from practice, upholding the charges that "following his retention, [Block] failed to institute litigation on behalf of his client and made repeated, deliberate misrepresentations concerning the status of the case." In the Matter of Block, 2010 N.Y. App. Div. LEXIS 6495 (1st Dept. Aug. 17, 2010).

15.    Moreover, the Appellate Division noted that "in the 2001 disciplinary proceeding, [Block] testified that he and his firm had taken steps to reduce and manage more effectively his

caseload, and had increased supervision by senior partners. Yet, approximately five years after his six-month suspension expired, and despite being monitored by his firm (according to a named partner), [Block] committed the misconduct at issue." *Id.*

16.     Finally, the Appellate Division reported that "[d]uring oral argument before the Hearing Panel, [Block's] counsel, a partner at [Block's] firm, stated that [Block] had been monitored, and reiterated [Block's] testimony that the Parry Murray case was 'aberrational' and had fallen 'though the cracks.'" *Id.*

17.     Defendants' actions and failures in the matters set forth in this Complaint establish that Defendant Block's misconduct was far from "aberrational" and that the Defendant Partners each failed in their individual obligations to properly supervise and/or monitor Defendant Block and to protect the Defendant Law Firm's clients in general and Plaintiffs in particular.

## VENUE

18.     The transactions and occurrences at issue in this Complaint arose in the County of New York, State of New York.  Accordingly, venue is proper in this Court pursuant to N.Y. C.P.L.R. 503(c).

### FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### The Initial Representation of Plaintiffs

19.     In or about 1994, Plaintiffs retained the Defendant Law Firm to represent them in connection with certain lawsuits they wished to prosecute against their landlord.

20.     Plaintiffs met and discussed the matter with Defendant Block who was then an associate at the Defendant Law Firm.

21.     Defendant Block then introduced Plaintiffs to Defendant Goldberg, Defendant Scudieri and a third partner.

22.     As the partner in charge, Defendant Goldberg was responsible for supervising Defendant Block's work product and overseeing his caseload. Therefore, Defendant Goldberg had an obligation and duty to familiarize himself with Defendant Block's work for clients of the Defendant Law Firm.

23.     Those cases were duly commenced by the Defendant Law Firm and eventually settled or resolved to Plaintiffs' satisfaction.

24.     Plaintiffs developed a relationship of trust and confidence with the Defendants, including but not limited to Defendant Goldberg and Defendant Block as a result of their attorney-client relationship.

25.     As a result of the ongoing attorney-client relationship and the established relationship of trust and confidence, Plaintiffs justifiably and reasonably relied on Defendants to represent their interests when they had additional legal problems that required legal analysis.

### The Defendants' Deception Begins

26.     In or about 1997, Plaintiffs retained the Defendant Law Firm to prosecute certain claims sounding in tort committed by their landlord's alleged building manager, who became an owner of the building the following year.

27.     Plaintiffs were in constant litigation over various issues at 165 W 87th Street. Defendant Block and Defendant Law Firm represented Plaintiffs from Plaintiffs' initial meeting with Defendant Law Firm in 1994 in Landlord & Tenant matters with Plaintiffs' landlord. Defendant Block remained Plaintiffs' counsel in all matters from that point on.

28.     Plaintiffs left the building in or around the Spring of 2000, but Defendant Block remained Plaintiffs' attorney due to the cases he told Plaintiff he was pursuing on Plaintiffs' behalf. Defendant Block also represented Plaintiffs in cases at their current address.

29.     In one of these cases, Plaintiffs accused their landlord of hiring thugs to harass and assault them in an attempt to have Plaintiffs abandon their rent stabilized apartment, located in a brownstone on the Upper West Side of Manhattan.

30.     The hiring of these thugs was the most egregious highlight of a long-running harassment campaign against Plaintiffs which included untended mice and vermin, roof cave-ins, failures to repair, countless "run-ins", and failures to provide heat and hot water.

31.     The Defendant Law Firm, acting principally through Defendant Block, who was still an associate at the time and thus under the direct supervision of the Defendant Law Firm's partners, agreed that the Defendants' proposed action had merit and assured the Plaintiffs that the action would be filed and prosecuted to conclusion.

32.     Plaintiffs believed Defendant Block's representations to them.   Given the attorney-client relationship that existed between Plaintiffs and the Defendants, plaintiffs justifiably relied on Defendants, both jointly and severally, to protect their legal interests consonant with Defendants' fiduciary and other professional responsibilities and obligations.

33.     In preparing the Complaint for the Plaintiffs' action against their landlord, Defendant Block drafted and had Plaintiffs review various legal-looking documents.  In some instances, Defendant Block had them sign what appeared to be verifications of the pleadings.

34.     Soon after their initial meeting, Defendant Block informed Plaintiffs that he had filed the lawsuit for these tort claims.

35.     This statement was knowingly false.

36.     In fact, every statement made by Defendant Block to the Plaintiffs relating to commencing any action sounding in tort against the landlord, or to its status, or to any document created or referred to in connection with such actions or to any judgments obtained or attempts at recovery or collection of such judgments was false, and knowingly so.

37.     Moreover, each of the Defendant Partners knew or should have known of the falsity of the statements Defendant Block was making to Plaintiffs concerning any alleged ongoing litigation, either through (i) direct knowledge of the Defendant Law Firm's litigation calendar, (ii) their individual and/or collective failure in their duty to supervise and monitor their associate, as require by law and professional ethics, or (iii) their individual and/or collective failure in their duty to supervise and monitor their partner in conformance with the representations and assurances made to the Departmental Disciplinary Committee and the Appellate Division, First Judicial Department.

38.     In the following months, Defendant Block advised Plaintiffs of his several court appearances on their behalf to prosecute their action against the landlord.

39.     During this time, Plaintiffs repeatedly visited the Defendants at their office and discussed these matters with Defendant Block. During those visits, Plaintiffs often saw and spoke briefly with other partners, including but not limited to Defendant Goldberg.

40.     On information and belief, as a result of these discussions and meetings, each of the Defendant Partners was made aware of the lawsuit that the Defendant Law Firm was supposedly prosecuting on Plaintiffs' behalf.

41.     This statement was knowingly false.

42.     On or about late 1997, Defendant Block informed Plaintiffs that he had secured a default judgment against the landlord in the tort action in the amount of Three Hundred Twenty-Five Thousand dollars and no cents ($325,000.00).

43.     Soon thereafter, and seemingly in retaliation for the judgment against him, the landlord began a campaign of defamation against Plaintiffs, falsely accusing Plaintiff Heller of being a drug dealer and Plaintiff Pillitteri of prostitution.

44.     Plaintiffs brought this new matter to Defendant Block's attention, who, on information and belief, updated the other Defendant Partners on this new potential matter for the Defendant Law Firm.

45.     Defendant Block agreed that an action against the landlord would have merit and assured Plaintiffs that a lawsuit would be commenced on their behalf.

46.     As before, Defendant Block advised Plaintiffs that the lawsuit had been commenced and, later, of the several court appearances he had made on their behalf, on the landlord's failure to defend and on the eventual default judgment he had secured on their behalf, this time in the amount of Three Hundred and Fifty Thousand dollars and no cents ($350,000.00).

47.     These statements were knowingly false.

48.     As before, during the period of the pendency of this action, Plaintiffs also made multiple visits to the Defendant Law Firm and discussed their matter with Defendant Block and, during those visits, saw and spoke with the other partners, including but not limited to Defendant Goldberg.

49.     On information and belief, as a result of these discussions and meetings, each of the Defendant Partners was made aware of the lawsuit that the Defendant Law Firm was supposedly prosecuting on Plaintiffs' behalf.

50.     By late 1998, Defendants had expressly represented to Plaintiffs that the Defendant Law Firm had secured two default judgments against the landlord in a total amount of Six Hundred Seventy Five Thousand dollars and no cents ($675,000.00) and that they would begin to collect on those judgments, including but not limited to filing a lien against property owned by the landlord.

51.     These statements were knowingly false.

52.     On or around Labor Day, 1999, Defendant Block advised Plaintiffs that a lien was being filed against the building in which they lived whose purpose would be to secure payment of the two default judgments.

53.     This statement was knowingly false.

54.     In or about the summer of 1999, Defendant Block negotiated, with the assistance of Defendant Scudieri, a surrender of Plaintiffs' rent subsidized apartment to the landlord for Sixty Thousand dollars and no cents ($60,000.00) from which Defendants took a fee of Ten Thousand dollars and no cents ($10,000.00).

55.     As part of this settlement, Defendant Block induced Plaintiffs to execute a general release in favor of the landlord by advising them that the release did not cover or vitiate the default judgments he had already obtained on their behalf.

56.     Plaintiffs justifiably relied on these representations and had no reason to believe that any of these representations was anything but complete, truthful and accurate.

57.     Over the ensuing years, Plaintiffs had numerous meetings at the Defendant Law Firm and discussed the progress of the collection process with Defendant Block. As usual, during these visits, Plaintiffs often saw and spoke with the other partners, including but not limited to Defendant Goldberg.

58.     As a result of these conversations and meetings, each of the Defendant Partners was aware of the collection matter that the Defendant Law Firm was handling on behalf of Plaintiffs.

### The Deceptions Multiply and the Defendant Partners Do Nothing

59.     In or about the summer of 2001, Defendant Block confirmed to Plaintiffs that he had taken a six month "sabbatical" from the Defendant Law Firm but had at all times remained in touch on his legal matters.

60.     Unbeknownst to Plaintiffs, and deliberately kept from them by the Defendant Partners, was the fact that Defendant Block had in fact been suspended from the practice of law for six months by order of the Appellate Division, First Judicial Department.

61.     Defendant Block's punishment was meted out for his personal misconduct of

> deliberately deceiving clients (a husband and wife) through lies and fabrication of documents to corroborate those lies, and by neglecting the clients' affairs.... [misconduct which] was aggravated by his deliberate oral and written misrepresentations in a protracted effort to cover up his delinquencies, including false assurances to his client as to the status of their case when, in fact, the matter was never commenced. Indeed, respondent went so far as to instruct his clients to appear in court on two separate occasions for a nonexistent hearing, and to fabricate a letter, which he claimed was sent to a Judge, and three proposed orders.

In the Matter of Paul S. Block, 282 A.D.2d 12, 723 N.Y.S.2d 23 (1st Dept. 2001).

62.     Similarly, unbeknownst to Plaintiffs from at least 2001 forward, Defendant Block's work as a partner of the Defendant Law Firm was to be closely supervised and

monitored by "senior partners" at the Law Firm ("Defendant").  Matter of Block, 2010 N.Y.
App. Div. LEXIS 6495 (1st Dept. Aug. 17, 2010).

63.    None of the Defendant Partners informed Plaintiffs of any of these facts either in
2001 or at any relevant time when it could perhaps have still served to mitigate the damages
being caused by Defendant Block's continuing misconduct.

64.    While Defendant Block had been an associate at the Defendant Law Firm, the
Defendant Partners were under a legal and professional obligation to supervise and otherwise
monitor his work with the Defendant Law Firm's clients, such as Plaintiffs.

65.    Had the Defendant Partners properly carried out their obligation to supervise and
monitor Defendant Block, his misconduct would have been discovered *ab initio.*

66.    Had any of the individual Defendant Partners reviewed, monitored or verified
Defendant Block's work on behalf of Plaintiffs, in conformity with what was represented to the
Appellate Division, First Department, Defendants would have discovered that Defendant Block
had never commenced either of the two lawsuits on Plaintiffs behalf, and therefore would have
discovered that there were no default judgments entered nor any funds to be collected as a result
of any alleged judgment against the landlord.

67.    In light of the obligations they had expressly taken upon themselves in their
representations and assurances to the Appellate Division, First Judicial Department, in addition
to what they otherwise were legally obligated to do, the Defendant Partners knew or should have
known that Defendant Block had never instituted either of the two lawsuits on behalf of
Plaintiffs and that there were no default judgments against the landlord nor any funds to be
collected as a result of any alleged default judgments against the landlord.

68.     By failing to inform plaintiffs of the true circumstances of Defendant Block's suspension from practice, the Defendant Partners deprived Plaintiffs of material information that directly impacted Plaintiffs' relationship with Defendant Block and Plaintiffs understanding of their current economic situation and future prospects.

69.     Left to believe that they had recovered substantial monetary damages against the landlord and that they would soon be receiving those funds, Plaintiffs made certain irreversible economic decisions in justifiable reliance on Defendant Block's continuing positive representations and on the other the Defendant Partners' failure to divulge to Plaintiffs the true nature of Defendant Block's legal work and of his actual status before the Bar of the State of New York.

70.     In or about 2005, Defendant Block informed Plaintiffs that the property subject to the lien had been sold for Three Million and Five Hundred Thousand dollars and no cents ($3,500,000.00). Block ("Defendant") further advised Plaintiffs that he had appeared on their behalf before a judge who directed that Plaintiffs' judgment, including accrued annual statutory interest of nine percent (9%), be held in an escrow account by New York City's Department of Finance ("City Department of Finance") pending review of other liens against the building. First, this was in September of 2005.

71.     Defendant Block told Plaintiffs that Plaintiffs would be having a closing on the building sale in December 2005 and the sale proceeds would be held by a title company. The proceeds were not released by the title company (according to Defendant Block), until Defendant Block said that a Judge ordered the money to be moved to the City Department of Finance.

72.     These statements were knowingly false.

73.     Plaintiffs had no reason to dispute any of these representations as they justifiably and reasonably relied upon their attorney.  Plaintiffs had no independent experience in legal matters or the law and procedures relating to the collection of judgments.

74.     By this time, Plaintiffs had developed a personal relationship with the Defendant Law Firm its Defendant Partners.  Indeed, they were all on a first name basis.

75.     During the time of Defendant Block's purported collection, Plaintiffs told the various Defendant Partners who inquired as to their business at the Defendant Law Firm, that Plaintiffs were there "to collect [their] millions."

76.     In some instances, when one of the Defendant Partners saw either Plaintiff at the Defendant Law Firm, that partner would ask how the collection process was going.

77.     The Defendant Partners knew or should have known that there were no "millions" for Plaintiffs to collect and were under an obligation to advise Plaintiffs of that fact.

78.     Yet, even at this point, the Defendant Partners took no action to monitor Defendant Block's cases or investigate the true status of Plaintiffs litigations, let alone advise Plaintiffs of it.

79.     The Defendant Partners failed to inform Plaintiffs that neither action as to which they had been told default judgments had been obtained had ever been commenced, or that the statute of limitations had now expired.  They failed to inform Plaintiffs that Defendant Block may have falsely induced them to release landlord from any liability when they had settled with him and received money to induce them to vacate their rent stabilized apartment.

80.     In or about 2006, Defendant Block advised Plaintiffs that he had persuaded the City Department of Finance to transfer their funds into a separate account pending disbursement, but that this disbursement could only be accomplished in a series of transfers in smaller amounts.

Page -13-

81. This statement was knowingly false.

82. Over the next several months, Defendant Block had Plaintiffs come to the Defendant Law Firm and execute a series of documents that he claimed were required before any monies could be disbursed.

83. When Plaintiffs asked Defendant Block when their funds would be released, he told them that the judge had ordered that no funds be disbursed until all of the Plaintiffs' funds had been successfully transferred to the separate account at the City Department of Finance.

84. This statement was knowingly false.

85. Plaintiffs made numerous written and in-person pleas to the Defendant Law Firm that this treatment was unfair and that they needed the money disbursed because they had begun to make expenditures in anticipation of receiving the money that Block had assured them would be disbursed in the very near future. These expenditures included, but were not limited to, the support and care of Plaintiff Pillitteri's aged and very ill stepmother.

86. In or about December 2006, Defendant Block advised Plaintiffs that he had persuaded the Court to allow Plaintiffs to receive a monthly "stipend," in amounts varying between $1,000 and $2,500, while they awaited the complete disbursement of their funds.

87. These statements were knowingly false.

88. From that time forward, Plaintiffs began receiving the monthly stipend amount in checks drawn on the Defendant Law Firm's escrow account.

89. Unbeknown to Plaintiffs, and deliberately concealed from them by Defendants, on or about December 1, 2006 another complaint was filed with the Departmental Disciplinary Committee against Defendant Block.

90.     This complaint alleged that Defendant Block had falsely informed a corporate client of the Defendant Law Firm that he had instituted litigation on that client's behalf, had obtained a default judgment in its favor and had along the way made a variety of false representations in connection with that action.

91.     This conduct is, of course, virtually identical to Defendant Block's treatment of Plaintiffs here and the behavior giving rise to his six months suspension from practice in 2001.

92.     The failure by the other Defendant Partners to warn or otherwise notify Plaintiffs of Defendant Block's lack of integrity and responsibility, or to remove him from handling their matters, or to deny Defendant Block check-writing authority over the Defendant Law Firm escrow account resulted in Plaintiffs continuing to trust and rely upon Defendant Block's representations relating to the default judgments.

93.     Further, these acts caused Plaintiffs to continue to make economic decisions that would irrevocably prejudice their credit and economic standing.

94.     As a result of the Defendant Partners' multiple failures in connection with their obligation to safeguard and protect Plaintiffs' legal interests, Plaintiffs continued to inquire of Defendant Block when they could expect to receive the balance of their funds held in escrow by the City Department of Finance.

95.     In or about 2007, Defendant Block told Plaintiffs that the City Department of Finance was refusing to consolidate the judgment funds in a single escrow fund so as to allow its full disbursement.

96.     This statement was knowingly false.

97.     Defendant Block later told Plaintiffs that he had appeared before the judge and convinced the Court to impose a penalty on the New York City Department of Finance equal to one percent (1%) per day until it transferred the entire amount.

98.     This statement was knowingly false.

99.     Responding to subsequent inquiries by Plaintiffs, Defendant Block told them that the City Department of Finance had refused to comply with the judge's direction.  Defendant Block also advised Plaintiffs that as a result of the daily penalties against the City Department of Finance, their judgment was then valued at over fourteen million two hundred thousand dollars ($14,200,000).

100.     These statements were knowingly false.

101.     In or about 2008, Defendant Block told Plaintiffs that he would institute a suit against the City Department of Finance regarding its failure to transfer Plaintiffs' funds into an appropriate escrow account.

102.     This statement was knowingly false.

103.     Defendant Block later informed Plaintiffs that he had secured a default judgment against the City Department of Finance in the amount of Five Million dollars and no cents ($5,000,000.00).

104.     This statement was knowingly false.

105.     During the period of 2008 to 2010, in response to Plaintiffs' continuing demands for information relating to their judgment proceeds and the reasons for the seemingly never-ending delays, Defendant Block told Plaintiffs that the Court had directed increases in the monthly stipend payments, first to One Thousand Five Hundred Dollars and no cents ($1,500.00) then eventually to Two Thousand Five Hundred Dollars and no cents ($2,500.00).

106.   This statement was knowingly false.

107.   Plaintiffs then began to receive monthly checks in the increased amounts from the Defendant Law Firm's escrow account.

108.   Deprived of any information concerning Defendant Block's misconduct and fraud which the Defendant Partners could have easily discovered had they bothered to inquire, Plaintiffs continued in their justified reliance on Defendant Block's false statements as to the status of their case and continued to make irreversible economic decisions to their detriment.

109.   On or about March 8, 2010 and in response to Plaintiffs repeated inquiries, Defendant Block sent Plaintiffs a copy of a proposed order dated March 8, 2010, that Defendant Block explained he was going to submit to the Court for its 'so ordering'.

110.   The proposed order set the amount of Plaintiffs' judgment at Ten Million Seven Hundred Eighty Three Thousand Two Hundred Twenty dollars and thirty six cents ($10,783,220.36).

111.   The proposed order further directed that, upon the Court's 'so ordering', which Defendant Block said was a mere formality, all the funds were to be disbursed "forthwith to Plaintiffs."

112.   The proposed order was a fraud concocted by Defendant Block, designed to continue to mislead Plaintiffs.

113.   Armed with this information, Plaintiffs breathed a sigh of relief knowing that their debts, incurred in anticipation of receiving the monies due them from their judgments in 1996 and 1998, would be cleared and they would be debt free with additional funds to allow them to live a future of some comfort.

114.    The proposed order was, of course, never submitted for signature and no part of the alleged escrowed funds from the alleged default judgments was ever distributed to Plaintiffs.

115.    Still trusting in Defendant Block's integrity, Plaintiffs had numerous additional conversations with him and the Defendant Partners about the ongoing failure to collect the escrowed judgment funds.

### The Fraud Eventually Collapses

116.    Unknown to Plaintiffs, effective August 17, 2010, the Appellate Division: First Judicial Department suspended Defendant Block for a period of eighteen months.

117.    This suspension was based on the findings arising out of the complaint lodged against Defendant Block in December 2006.

118.    Nevertheless, on or about September 23, 2010, Defendant Block met with Plaintiffs, though not at the Defendant Law Firm, and told them that he had convinced the judge to increase their stipend to Four Thousand dollars and no cents ($4,000.00) while the details of disbursing the judgment amount was finalized through the New York City Department of Finance's bureaucracy.

119.    This statement was knowingly false.

120.    Defendant Block also confirmed that the Defendant Law Firm's escrow account now contained approximately Nine Million dollars of their judgment award but were prevented from disbursing until the full amount was received.

121.    This statement was knowingly false.

122.    Defendants issued four stipend payments to Plaintiffs after the August 17, 2010 suspension of Defendant Block.

123.    After receiving two stipend payments in that higher amount, one on September 23 and the other on September 28, Plaintiffs received no further checks from the Defendant Law Firm.

124.    Plaintiff Pillitteri received her last check on or about September 23

125.    Plaintiff Heller received his last check on September 28.

126.    Though Defendant Block was suspended from the practice of law effective September 17, the Defendant Law Firm and the Defendant Partners took no action to prevent him from continuing to have access to and write checks from the firm's escrow account.

127.    On November 9, 2010, Defendant Block told Plaintiff Heller to expect a disbursement of Seven Million dollars and no cents ($7,000,000.00) by the following day.

128.    Later that day, Plaintiffs contacted Defendant Block for an update and to ask follow-up questions regarding the disbursement. Defendant Goldberg responded to this call and began to ask probing questions of Plaintiff Heller as to the status of his cases. Later in the call, Defendant Goldberg admitted that Defendant Block had been suspended from practice and that the Defendant Law Firm had no active cases with Plaintiffs.

129.    The next day, Plaintiffs retained counsel to investigate the conduct of Defendants in their more than decade long representation of Plaintiffs.

130.    Defendant Block has since been arrested and charged by the District Attorney's Office, New York County with Grand Larceny in the Second Degree.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Fraudulent Misrepresentation)

131.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs with the same force and effect as if more fully set forth at length herein.

132.   Defendant Block made representations to Plaintiffs that were knowingly false when made and that were made for the purpose of having Plaintiffs rely on them.

133.   Plaintiffs justifiably relied on these representations and Plaintiffs took certain actions to their detriment.

134.   Among the false representations were statements that two lawsuits had been filed when neither one had been commenced, that default judgments had been obtained, that various hearings were occurring before a judge relating to collecting on the judgments and that the value of those judgments was in excess of ten million dollars.

135.   As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial but believed to be not less than ten million dollars and no cents ($10,000,000.00).

## AS AND FOR A SECOND CAUSE OF ACTION
### (Fraudulent Misrepresentation)

136.   Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs with the same force and effect as if more fully set forth at length herein.

137.   Defendant Partners, by their omissions, permitted Defendant Block's multiple misrepresentations to Plaintiffs to remain uncorrected over a course of years.

138.   Plaintiffs justifiably relied to their detriment on these omissions.

139.   In particular, the Defendant Partners never corrected Defendant Block's false representations that two lawsuits had been filed when neither one had been commenced, that default judgments had been obtained, and that various hearings were occurring before a judge relating to collecting on the judgments and that the value of those judgments was in excess of ten million dollars.

140.   Moreover, the Defendant Partners never advised Plaintiffs of Defendant Block's suspension from the practice of law in 2001 or of his suspension in 2010.   It was not until November of 2010 that the Defendant Partners admitted – at Plaintiff's request for information – that Defendant Block had been suspended.

141.   As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial but believed to be not less than ten million dollars and no cents ($10,000,000.00).

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Failure to Supervise)**

142.   Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs with the same force and effect as if more fully set forth at length herein.

143.   While Defendant Block was an associate at the Defendant Law Firm, the Defendant Partners were under a duty to supervise his work on behalf of the Law Firm.

144.   The Defendant Partners failed to properly supervise Defendant Block's work on matters relating to Plaintiffs, in that they allowed Defendant Block to convince Plaintiffs that two lawsuits had been commenced on their behalf and, over time, that the Defendant Law Firm ("Defendant") had obtained two default judgments whose value, by 2008, had reached over ten million dollars.

145.   As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial but believed to be not less than ten million dollars and no cents ($10,000,000.00).

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(Failure to Supervise)**

146.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs with the same force and effect as if more fully set forth at length herein.

147.    While Defendant Block was a partner at the Defendant Law Firm, and after Defendant Goldberg's representations made in connection with Defendant Block's disciplinary proceeding in 2001, the Defendant Partners were under a duty to supervise Defendant Block's legal work, including work done in connection with Plaintiffs.

148.    The Defendant Partners failed to properly supervise Defendant Block's work on matters relating to the Plaintiffs and thereby allowed Defendant Block to mislead Plaintiffs as to the status of those matters.

149.    As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial but believed to be not less than ten million dollars and no cents ($10,000,000.00).

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Legal Malpractice)**

150.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs with the same force and effect as if more fully set forth at length herein.

151.    Having been retained by Plaintiffs on two legal matters in 1997 and 1998, Defendants were under a legal obligation to represent the Plaintiffs' interests pursuant to an appropriate standard of care.

152.    From 1997 to November 2010, Defendants deviated from that standard of care by failing to file the lawsuits it had informed Plaintiffs it would file, by providing Plaintiffs with false and/or misleading legal advice in connection with an agreement to vacate their rent

stabilized apartment, and by providing Plaintiffs with a continuing series of false updates as to the status of their two lawsuits.

153.    As a result of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial but believed to be not less than ten million dollars and no cents ($10,000,000.00).

WHEREFORE, Plaintiffs demand judgment as follows:

(i)    on the first cause of action, an amount to be determined at trial, but in no event less than the sum of $10,000,000 as against Defendants jointly and severally;

(ii)    on the second cause of action, an amount to be determined at trial, but in no event less than the sum of $10,000,000 as against Defendants jointly and severally;

(iii)    on the third cause of action, an amount to be determined at trial, but in no event less than the sum of $10,000,000 as against Defendants jointly and severally;

(iv)    on the fourth cause of action, an amount to be determined at trial, but in no event less than the sum of $10,000,000 as against Defendants jointly and severally;

(v)    attorneys' fees in an amount to be determined at trial as against Defendants jointly and severally; and

# VERIFICATION

I am a Plaintiff herein.  I have read the foregoing and affirm that the pleading is true to my knowledge, except as to matters alleged on information and belief, and that as to those matters I believe them to be true.  The grounds of my belief as to all matters not stated upon my knowledge are my books and records.

Dated: April 20, 2011
New York, New York

By: _____
John Heller

By: _____
Jo Anna Pillitteri

Sworn to before me on this 20th day of April, 2011

_____
Notary Public

JEFFREY B. EINHORN
NOTARY PUBLIC-STATE OF NEW YORK
No. 02EI6195848
Qualified In Kings County
My Commission Expires November 03, 2012

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------------X
JOHN HELLER and JO ANNA PILLITTERI,

                 Plaintiffs,

   -against-

GOLDBERG, SCUDIERI, & LINDENBERG, P.C.
GOLDBERG, SCUDIERI, & LINDENBERG, & BLOCK, P.C.
ALAN J. GOLDBERG, DAVID G. SCUDIERI,
MARK K. LINDENBERG, PAUL S. BLOCK
                Defendant.
------------------------------------------------------------------------X

Index No.: *105061/11*

SUMMONS  APR 2 8 2011

TO THE ABOVE NAMED DEFENDANT(S):

     **YOU ARE HEREBY SUMMONED** and required to serve upon Plaintiff's attorney, an answer to the complaint in this action within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty (30) days after the service is complete if this summons is not personally delivered to you within the State of New York); and, in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated:     New York, New York
            April 21, 2011

                         LAW OFFICES OF JEFFREY LICHTMAN

                         By: _____
                         Jeffrey Lichtman, Esq.
                         Attorney for Plaintiff
                         John Heller and
                         Jo Anna Pillitteri
                         750 Lexington Avenue
                         New York, New York 10022

- and –

Nesenoff & Miltenberg, LLP
Andrew T. Miltenberg, Esq.
Attorneys for Plaintiff
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500

To:   GOLDBERG, SCUDIERI, & LINDENBERG, P.C.
GOLDBERG, SCUDIERI, & LINDENBERG, & BLOCK, P.C.
ALAN J. GOLDBERG
DAVID G. SCUDIERI
MARK K. LINDENBERG
PAUL S. BLOCK

# EXHIBIT B

# Admiral Insurance Company

1255 Caldwell Road,  Cherry Hill, NJ 08034

**Declarations Page**

## Lawyers Professional Liability Insurance

**CLAIMS MADE WARNING FOR DECLARATIONS: THIS POLICY PROVIDES COVERAGE ON A CLAIMS MADE AND REPORTED BASIS SUBJECT TO ITS TERMS. THIS POLICY APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD THAT MAY APPLY.**

**PLEASE READ AND REVIEW THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

Whenever printed in this Declarations Page, the boldface type terms shall have the same meanings as indicated in the Policy.

Policy Form: LPL 9300 (04-09)

Policy Number: 9954283

| | | |
|---|---|---|
| Item 1. | Name and Address of **Named Insured:** | |

Goldberg, Scudieri, Lindenberg & Block, P.C.
Suite 1401
45 West 45th Street
New York, NY  10036

Person designated to receive all correspondence from the **Insurer:**
Alan J. Goldberg
Managing Partner

**NEW YORK DISCLOSURE NOTICE**
THE INSURER(S) NAMED HEREIN IS (ARE) NOT LICENSED BY THE STATE OF NEW YORK, NOT SUBJECT TO ITS SUPERVISION, AND IN THE EVENT OF THE INSOLVENCY OF THE INSURER(S), NOT PROTECTED BY THE NEW YORK STATE SECURITY FUNDS. THE POLICY MAY NOT BE SUBJECT TO ALL OF THE REGULATIONS OF THE INSURANCE DEPARTMENT PERTAINING TO POLICY FORMS.

Item 2.   **Policy Period:**   From May 25, 2010 (inception date) to  May 25, 2011 (expiration date)
*(Both dates at 12:01 a.m. Standard Time at the address of the **Named Insured**)*

Item 3.   Limit of Liability for the **Policy Period** (inclusive of **Damages** and **Claims Expense**):
  A.   $500,000 each **Claim**, but in no event exceeding
  B.   $1,000,000 in the aggregate for all **Claims**.

Item 4.   Applicable Deductible:   $25,000

Item 5.   Premium:   $48,500

Item 6.   Endorsements attached:
  LPL 91200 (04-09)   Service of Suit

Item 7.   Notice to the **Insurer** as provided in sections VII. A. and VII. B. and any information furnished to the **Insurer** as provided in section VI. B. shall be sent to:
  Monitor Liability Managers, LLC, Claims Department
  Address:  2850 West Golf Road, Suite 800, Rolling Meadows, IL  60008-4039
  Fax:   (847) 806-4017
  Email:   newclaim@monitorliability.com

  All other notices required to be given to the **Insurer** under this Policy shall be sent to:
  Monitor Liability Managers, LLC
  Address:  2850 West Golf Road, Suite 800, Rolling Meadows, IL  60008-4039
  Fax:   (847) 806-6282

These Declarations along with the completed and signed **Proposal** and the Lawyers Professional Liability Insurance Policy shall constitute the contract between the **Named Insured** and the **Insurer**.

Authorized Representative: _Sandra C. Nelson_ _____   Date Issued:   June 15, 2010

# Admiral Insurance Company

1255 Caldwell Road, Cherry Hill, NJ 08034

Page 1 of 1

## Service of Suit

It is understood and agreed that in the event of the failure of the **Insurer** hereon to pay any amount claimed to be due hereunder, the **Insurer**, at the request of the **Insured** (or Reinsured), will submit to the jurisdiction of any court of competent jurisdiction within the United States of America or Canada and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court. Nothing in this endorsement constitutes or should be understood to constitute a waiver of the **Insurer's** rights to commence an action in any court of competent jurisdiction in the United States or Canada, to remove an action to a United States District Court, or to seek a transfer of an action to another court as permitted by law.

It is further agreed that service of process in such suit may be made upon Daniel A. MacDonald, Senior Vice President of Admiral Insurance Company, 1255 Caldwell Road, P.O. Box 5725, Cherry Hill, New Jersey 08034-3220, or his designee, and that in any suit instituted against any one of them upon this contract, the Company will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named is authorized and directed to accept service of process on behalf of the **Insurer** in any such suit and/or upon the request of the **Insured** (or Reinsured) to give a written undertaking to the **Insured** (or Reinsured) that it or they will enter a general appearance upon the **Insurer's** behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States of America or province of Canada, which makes provision therefor, the **Insurer** hereby designates the Superintendent, Commissioner, Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the **Insured** (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and the **Insurer** hereby designates the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

Whenever printed in this Endorsement, the boldface type terms shall have the same meanings as indicated in the Policy Form. All other provisions of the Policy remain unchanged.

| Insured | Policy Number |
|---|---|
| Goldberg, Scudieri, Lindenberg & Block, P.C. | 9954283 |
| Effective Date of This Endorsement | Authorized Representative |
| 05/25/2010 | |

LPL 9300 (04-09)                    22226-954283-665160                    LPL 91200 (04-09)

# Admiral Insurance Company

# Lawyers Professional Liability Insurance Policy

*This is a Claims Made Policy. Please read it carefully.*

## CLAIMS MADE WARNING FOR POLICY

**NOTICE: THIS POLICY PROVIDES COVERAGE ON A CLAIMS MADE AND REPORTED BASIS SUBJECT TO ITS TERMS. THIS POLICY APPLIES ONLY TO ANY CLAIM FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR ANY EXTENDED REPORTING PERIOD THAT MAY APPLY.**

**PLEASE READ AND REVIEW THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

In consideration of the payment of the premium, in reliance on all statements in the **Proposal** and all other information provided to the **Insurer**, and subject to all provisions of this Policy, the **Insurer** and **Insureds** agree as follows:

## I. Insuring Agreement

### Lawyers Professional Liability Insurance

This Policy shall pay on behalf of the **Insured** all **Damages** and **Claims Expense** that the **Insured** shall become legally obligated to pay, arising from any **Claim** first made against the **Insured** during the **Policy Period** and reported to the **Insurer** in writing during the **Policy Period** or within 60 days thereafter, for any actual or alleged **Wrongful Act**, provided that prior to the inception date of the first Lawyers Professional Liability Insurance Policy issued by the **Insurer** to the **Named Insured**, which has been continuously renewed and maintained in effect to the inception of this **Policy Period**, any **Insured** did not know, or could not reasonably foresee that such actual or alleged **Wrongful Act** might reasonably be expected to be the basis of a **Claim**.

## II. Extended Reporting Periods

A.  If the **Named Insured** cancels or if the **Insurer** or the **Named Insured** refuses to renew this Policy, then the **Named Insured** shall have the right, upon payment of the appropriate percentage of the "full annual premium", as provided in section II. B., to an extension of the coverage granted by this Policy with respect to any **Claim** first made and reported during the appropriate period of months after the date upon which the **Policy Period** ends, but only with respect to any **Wrongful Act** fully occurring prior to the end of the **Policy Period** and otherwise covered by this Policy. Such appropriate period of months shall be referred to as the Extended Reporting Period. As used herein, "full annual premium" means the premium level in effect immediately prior to the end of the **Policy Period**. The rights contained in this paragraph shall terminate, however, unless written notice of such election together with the additional premium due is received by the **Insurer** within 60 days of the effective date of cancellation or non-renewal.

B.  The percentage of the "full annual premium" and period of months for the Extended Reporting Period shall be:
1.  12 months Extended Reporting Period for 100 percent of the "full annual premium" of the Policy, or
2.  24 months Extended Reporting Period for 150 percent of the "full annual premium" of the Policy, or
3.  36 months Extended Reporting Period for 185 percent of the "full annual premium" of the Policy, or
4.  60 months Extended Reporting Period for 250 percent of the "full annual premium" of the Policy.

C.  The additional premium for the Extended Reporting Period shall be fully earned at the inception of the Extended Reporting Period. The Extended Reporting Period is not cancelable.

D.  As a condition precedent to the right to purchase the Extended Reporting Period, the total premium for this Policy and all Deductible obligations must have been paid.

The descriptions in the headings of this Policy are solely for convenience, and form no part of the terms and conditions of coverage.